# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| BHAKTAVATSALA R. APURI. M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:16-CV-363-TLS |
| | ) | |
| PARKVIEW HEALTH SYSTEMS, INC., | ) | |
| PARKVIEW HOSPITAL, INC., and | ) | |
| ROY ROBERTSON, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Plaintiff, Dr. Bhaktavatsala R. Apuri, is a cardiologist of Indian descent. After his privileges at Parkview Hospital were not renewed, he sued Parkview, alleging race discrimination under 42 U.S.C. § 1981 and state law claims relating to the non-renewal of his privileges. He also sued Dr. Roy Robertson for intentional interference with a business relationship for the role Dr. Robertson had in the peer review process, which the Plaintiff contends led to a tainted and biased review. Even before the discovery deadline passed, the Defendants filed a Motion to Exclude [ECF No. 35], which centers on the expert witness report of Dr. Jonathan Marmur.

Dr. Marmur assessed the Plaintiff's competence as an interventional cardiologist by reviewing nineteen of his cases. Based on his review, Dr. Marmur concluded that the Plaintiff should have no restrictions in the domain of diagnostic cardiac catheterization. Additionally, he believed, based on the stenting procedures performed in the cases he was given to review, that the Plaintiff was independently capable of successfully performing percutaneous coronary intervention in at least moderate to high risk scenarios. The Defendants' Motion does not seek to prevent Dr. Marmur from offering his opinions on these matters, including the medical care and

procedures the Plaintiff provided to specific patients. The Defendant's Motion targets the matters contained in the last three paragraphs of Dr. Marmur's report.

In the paragraphs at issue, Dr. Marmur suggests reasons, other than incompetence or inability, why the Plaintiff may have requested consultation and assistance from his colleagues while providing treatment. Dr. Marmur also writes:

> There is a reason that our concept of justice has as its foundation the notion of innocent until proven guilty. There is a reason that the basis of clinical research is the null hypothesis; that establishing causality requires vigorous standards and meaningful data that is verifiable and reproducible. In my opinion, the basis upon which very harsh measures were brought to bear upon Dr. Apuri's practice of medicine did not meet these standards.

(ECF No. 35-1 at 42.) In closing, Dr. Marmur states that "it should be noted that asking for help is behavior that should be encouraged in the medical community," and points to the safety conscious aviation industry as a model to follow.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Lees v. Carthage*, 714 F.3d 516, 521 (7th Cir. 2013) (explaining that Rule 702 has superseded *Daubert*, but that its standard of review is still applicable). In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802,

804 (7th Cir. 2012) (quoting Fed. R. Evid. 702). In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the court is to "scrutinize the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Id.* at 805 (quoting *Kumho Tire*, 526 U.S. at 152); *see also United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013) (noting that "expert evidence is not limited to 'scientific' evidence . . . [but] includes any evidence created or validated by expert methods and presented by an expert witness that is shown to be reliable").

Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("[W]e 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

District courts apply the *Daubert* framework described above using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). First, the court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. If so, the court must then decide whether the reasoning or methodology underlying the expert's testimony is reliable. If these two requirements are met, the court must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence

or to determine a factual issue. *See id.* (citing *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)). Statements in an expert report that are not relevant to the issues to be tried, will not be permitted. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 805–06 (7th Cir. 2013) (No matter the nature of the witness's expertise, Rule 702 establishes not only a standard of evidentiary reliability, it requires a valid connection to the pertinent inquiry as a precondition to admissibility).

The Court, at this juncture, has limited facts about the litigation before it. The Motion to Exclude was not filed in connection with a dispositive motion or an impending trial. Although discovery has closed, motions to compel are still pending. This procedural posture, however impacts only the relevance prong of the gatekeeping function. The Court need not reach the relevance inquiry unless if first finds that the proposed testimony is reliable. To that end, the Court has sufficient information to make a determination.

The Court agrees with the Defendant that the challenged portion of Dr. Marumur's report is not admissible as expert testimony, regardless of the legal claims the Plaintiff advances or the facts that will ultimately be in dispute. For example, Dr. Marmur's conjecture about what might have prompted the Plaintiff to request consultation and assistance is not an appropriate subject for expert testimony. It is not based on Dr. Marmur's specialized knowledge, not based on sufficient facts or data, not the product of reliable principles and methods or a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. There was no "intellectual rigor," *Kumho Tire*, 526 U.S. at 152, involved in the speculation about the Plaintiff's potential motives. Thus, the following statement from Dr. Marmur's report is not admissible as expert testimony:

4

> The fact that Dr. Apuri requests consultation and assistance from his colleagues does not constitute proof of inability nor incompetence. There may be other, totally legitimate and appropriate reasons, for such behavior. Perhaps, Dr. Apuri is not familiar with the equipment or precise operating procedure in that particular cath lab; perhaps he is trying to establish new relationships with colleagues and wants to learn from their experience; perhaps we [sic] had other urgent obligations and requested that a colleague stand in for him.

(Report 16–17, ECF No 35-1 at 42.)

Likewise, Dr. Marmur's statements about the fairness of the peer review process that was applied to the Plaintiff is not a reliable expert opinion. In support of his conclusions about the Plaintiff's peer review, Dr. Marmur references standards from other contexts, such as establishing guilt in a criminal case and causation in clinical research. He then opines that the peer review process that was applied to the Plaintiff did not meet these unrelated standards. Dr. Marmur's training and experience in cardiac catheterization and interventional cardiology qualify him to opine, based on his review of cases involving stenting procedures that the Plaintiff had performed, whether the Plaintiff "appears to possess the skills needed to perform PCI independently." (Report 16.) His assessment of the peer review process, however, was not based on reliable reasoning or methodology.

The peer review process, and what it entailed, is not even the subject of Dr. Marmur's report. His comments on the matter appear to be an add-on to an entirely separate analysis. "Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (noting that the Seventh Circuit has "[m]any times . . . emphasized that experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data" ). The Plaintiff's Response in opposition to the Motion to Exclude does not address these deficiencies. Rather, the Plaintiff's

position appears to be that, because Dr. Marmur has experience with medical peer reviews in his role as Chief of Cardiology, he should be permitted to offer his opinion that "the basis upon which very harsh measures were brought to bear upon Dr. Apuri's practice of medicine did not meet [criminal justice and clinical research] standards." (Report 17.) Dr. Marmur's experience does not change the fact that his conclusion was not based on principles and methods that are standard in the area of medical peer review. *See Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) (noting that proponent of an expert whose briefing "assume[d] that anyone with 'expertise" may testify as an expert" failed to meet requirement that experts provide analysis to substantiate an opinion). Because Dr. Marmur did not follow a reliable methodology in reaching his conclusions and reliably apply it to the specific facts of this case to arrive at his conclusion about the application of the peer review process to the Plaintiff, the statements are not admissible as expert testimony.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendant's Motion to Exclude [ECF No. 35]. The Plaintiff has requested, by way of his Response, that if the Court grants the Motion he be permitted to "disclose another witness with expertise in the field of medical credentialing/medical peer review." (Resp. 2.) If the Plaintiff believes that an extension of the deadline for expert disclosures is warranted, he must file the appropriate motion with the Court.

SO ORDERED on February 5, 2018.

    s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT